IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-cv-01095-JLK-GJR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

74.33 ACRES OF LAND, MORE OR LESS,
      LOCATED IN LA PLATA COUNTY,
      STATE OF COLORADO; AND
SHIRLEY ISGAR, et al.

      Defendants.

---

RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

This matter came on for an evidentiary hearing, pursuant to the Order of Reference of the Honorable John L. Kane dated January 13, 2004 and the Order Adopting Recommendation of Magistrate Judge dated December 5, 2005.

The Court, having received testimonial and documentary evidence at the hearing held in Durango, Colorado on July 12 and 13, 2006, and otherwise being duly advised in the premises, does hereby find the following facts to have been established during such hearing:

      1.      This matter came on for hearing on July 12 and 13, 2006, to resolve the conflicting claims of Shirley Isgar, Charles Isgar, Arthur Isgar, and Anne Isgar (the "Isgar Defendants" or the "Isgars") on the one hand and the Wheeler One Trust and the Collyer Family Trust (the "Wheeler Defendants" or the "Wheelers") on the other to Parcel RBR-5D(Fee), a 9.15 acre tract of land included in this action (Disputed Parcel).

      2.      By deed dated May 17, 1944, Edward Wheeler[1] acquired certain real

---

[1] Unless a specific person is identified, reference herein to the Wheelers means the entire Wheeler family, including Adeltha Collyer and her husband and children.

property located in La Plata County, Colorado, referred to herein as the "Wheeler Property". The legal description of the property purchased included Lot 3 of Section 7U and the NE¼SE¼ of Section 12U.

3.     By deeds dated February 26, 1964 and March 30, 1964, Arthur and Anne Isgar[2] acquired title to certain real property located in La Plata County, Colorado, referred to herein as the "Isgar Property". The property conveyed to the Isgars included Lot 4 of Section 7U and the SE¼SE¼ of Section 12U.

4.     The Wheeler Property and the Isgar Property are adjacent. The southern boundary of the Wheeler Property is the northern boundary of the Isgar Property.

5.     Edward Wheeler had a son, Ralph, and a daughter, Adeltha. Ralph Wheeler married Bessie Wheeler and they had four sons, Myron (deceased), Phil, Jerry, and Miles. Ralph Wheeler died in 2004. In March 2002, Ralph and Bessie Wheeler conveyed their interest in the Wheeler Property to the Wheeler One Trust. Exh. 34.

6.     Adeltha Wheeler married Bertram Collyer. In March, 2002, Adeltha and Bertram Collyer conveyed their interest in the Wheeler Property to the Collyer Family Trust. Exh. 33.

7.     From 1944 until the taking of portions of the Wheeler Property by the Bureau of Reclamation in 2003, the Wheeler family operated a cattle grazing operation on the Wheeler Property in conjunction with other lands owned by the Wheeler family in Colorado and New Mexico. Jerry Wheeler was present on the Wheeler Property during the summers from the early 1960's until 1979. He acted as the family's manager for the property from 1974 until 1979. Miles Wheeler was present on the Wheeler Property during the summers from the mid

---

[2] Unless a specific person is identified, reference herein to the Isgars means the Isgar Defendants (Arthur, Anne, Charles and Shirley Isgar).

1960's until the property was taken by the Bureau of Reclamation in 2003. Miles Wheeler acted as the family's manager of the property from 1984 until 2003.

8.      Shirley and Charles Isgar are the children of Arthur and Anne Isgar. Shirley Isgar is currently responsible for the Isgar Property. She attended college and medical school outside of Colorado from the early 1970's until 1992. Since 1992, she has been the owner and manager of a bed and breakfast in Hesperus, Colorado, and the owner of a bed and breakfast in Santa Fe, New Mexico.

9.      Following the purchase of the Isgar Property, Edward Wheeler commissioned a survey of the boundary between the Wheeler Property and the Isgar Property. A copy of the survey has not been located by the parties. Following the preparation of the survey, Edward Wheeler constructed a fence (referred to herein as the "Fence") between the Isgar and Wheeler Properties. The Fence forms the north edge of disputed Parcel RBR-5D(Fee). The south edge of Parcel RBR-5D(Fee) is the south boundary of Lot 3 of Section 7U and the NE¼SE¼ of Section 12U and north boundary of Lot 4 of Section 7U and the SE¼SE¼ of Section 12U as determined by the BLM Dependant Resurvey and Survey, dated November 19, 1982. Exh. 15.

10.      Edward Wheeler located the alignment of the Fence and the Wheelers constructed the Fence and paid all costs associated with the Fence. Miles Wheeler and Jerry Wheeler testified that the Fence was always intended to be a barrier fence, not a boundary fence, and that Edward Wheeler purposely constructed the Fence some distance to the north of the boundary. Shirley Isgar testified that it was her understanding that the Fence was intended to be a boundary fence.

11.      The Court finds that the Fence was constructed on what the parties believed to be the north/south boundary between the Wheeler Property and the Isgar Property.

The Court finds that no credible evidence was offered by the Wheelers that the Fence was constructed off the boundary or that the fence was a "barrier fence" or a "convenience fence" as contended by the Wheelers.

12.     Since the Fence was constructed in the summer of 1964, the Wheelers and the Isgars have conducted their affairs based upon, and acted in accordance with, the Fence serving as the north/south boundary between the Wheeler Property and the Isgar Property.  From 1964 until 2003, the Isgars used the property south of the Fence for grazing and all other purposes without objection or interference from the Wheelers.

13.  The Isgars have exercised exclusive dominion and control over all property south of the Fence, including the 150-foot strip immediately south of the Fence identified herein as the "Disputed Parcel", throughout the approximately 40 years since the Fence was constructed.  The Isgars engaged in activities and conduct evidencing such exclusive dominion and control including, but not limited to, the following:

a.      "chaining" or clearing the northern portion of this property up to the Fence;

b.      grazing cattle on this property ;

c.      cutting and removing Christmas trees from this property;

d.      hunting and authorizing others to hunt on this property;

e.      completely fencing, gating and generally keeping the gate padlocked on this property to exclude others from accessing this property;

f.      selling portions of this property to Animas Air Park and receiving compensation;

4

g.      licensing the Bureau of Reclamation ("BOR") to dig an 80-foot deep and approximately 250-foot diameter test pit along the south side of the Fence and retaining compensation for the same; and

h.      licensing the BOR to conduct archeological studies on this property.

14.     The Wheelers were aware of the Isgars' conduct and activities identified in the preceding paragraph, but asserted no objection to such conduct and activities by the Isgars prior to 2003.

15.     The Wheelers likewise engaged in activities and conduct acknowledging the Fence as the southern boundary of the Wheeler Property including, without limitation, the following:

a.      obtaining a survey, staking the boundary and constructing the Fence;

b.      executing a contract for sale, option agreement, warranty deed and quit claim deed, all referencing the Fence as the southern boundary of the Wheeler Property;

c.      submitting soil conservation and erosion maps to the United States Department of Agriculture identifying the Fence as the southern boundary of the Wheeler Property;

d.      authorizing its sand and gravel mining tenant, Nielsons, to submit maps and diagrams to the State of Colorado identifying the Fence as the southern boundary of the Wheeler Property; and

e.    selling the portion of the Wheeler Property north of the Fence to Mobile Premix in 1998 which identified the Fence as the southern boundary of the Wheeler Property.

16.    The Court concludes that the Wheelers did not specifically retain the Disputed Parcel as part of the sale to Mobile Premix.  Based on the evidence before the Court, the Court believes that in 1998, the Wheelers did not know of or believe that they owned the Disputed Parcel.  The Court does not find credible the Wheelers' contention that they retained ownership of the Disputed Parcel as a "good neighbor gesture" to serve as a buffer for the Isgars from the sand and gravel mining activities of the Wheelers' purchaser, Mobile Premix.

17.    From 1964 until 2003, the Wheelers moved cattle across the Isgar Property from the east end of Parcel RBR-5D(Fee) south to County Road 213 at times of their choosing without objection or interference from the Isgars..  The movement of cattle across the Isgar Property was occasional prior to 1979 but was a regular occurrence thereafter.

18.    From 1964 until 2003, the Wheelers used a road across the southern portion of the Isgar Property from County Road 213 to the Wheeler Property without objection or interference from the Isgars.  This road is shown on Exh. 26 and is labeled as "DIRT ROAD" on that exhibit.

19.    The Court finds no credible evidence supporting the existence of a "gentleman's agreement" between the Wheelers and the Isgars, by the terms of which the Isgars were given full and unrestricted use of property south of the Fence and, in return, the Wheelers were allowed to move cattle across the Isgar Property and to use the dirt road from County Road 213 to their property.

20.    The Court finds  no connection between the Wheelers construction of the Fence and the Isgars use of the disputed parcel south of the Fence and the Wheelers

6

movement of cattle across the Isgar property or their use of a road across the southern portion of the Isgar property to move cattle, and no gentlemen's agreement establishing such a connection.

21.     In April 1976, the Isgars and the Wheelers entered into a contract to sell certain tracts of specified acreages to parties representing an entity to be formed known as the Animus Air Park. Exh. 4. The parcels were generally described in a sketch attached as Exhibit A to the contract. The contract called for the parcels to be platted pursuant to a survey conducted by a surveyor to be chosen by the Animus Air Park.

22.     A plat was prepared by Donald Smith. Exh. 13. The plat shows the Fence as the boundary between parcels designated as belonging to the Isgars and the parcels designated as belonging to the Wheelers. The survey conducted by Donald Smith in 1976 as part of the Animas Air Park Transaction reflected the historical identification of 1/16th section lines and lot lines and is consistent with aerial photographs and other historical surveys admitted into evidence at the hearing.

23.     In November 1977, the Isgars executed a deed conveying two tracts to the Animas Air Park based on the Smith Plat. Exh. 7. The Isgars also executed a quitclaim deed in which they quitclaimed any interest in any of the tracts being conveyed to the Animas Air Park by the Wheelers. Exh. 12.

24.     In November 1977, the Wheelers executed a deed conveying three tracts to the Animas Air Park based on the Smith Plat. Exh. 9. The Wheelers also executed a quitclaim deed in which they quitclaimed any interest in any of the tracts being conveyed to the Animas Air Park by the Isgars. Exh. 11.

25.     The BLM completed a Dependant Resurvey and Survey, dated November 19, 1982 ("BLM Survey"). Exh. 15. The BLM Survey found the south line of Lot 3 of Section

7U and the NE¼SE¼ of Section 12U and the north line of Lot 4 of Section 7U and the SE¼SE¼ of Section 12U to be approximately 150 feet south of the Fence.

26.     By retracement survey adopted in November 1982, the Bureau of Land Management ("BLM") rejected monumentation of the Smith Survey and remonumented certain 1/16th section lines and lot lines.   There was conflicting evidence as to whether landowners in proximity to such remonumentation by the BLM were notified of the same.   With respect to this issue, the Court finds persuasive the testimony of Jerry Sherman, a highly experienced real estate attorney, who is legal counsel to and an officer of Animas Air Park, Inc., in addition to being a landowner in the area.   In particular, Mr. Sherman testified that he was unaware of the 1982 BLM Retracement Survey.   Thus, the Court finds that it was not generally known in the 1980s or 1990s that the BLM had remonumented the 1/16th section lines and lot lines in the area.

27.     Prior to the filing of this condemnation action by the BOR in 2003, the Wheelers made no assertion that they owned property south of the Fence and engaged in no activities or conduct whereby they asserted ownership, dominion or control over any property south of the Fence.

28.     It is the conclusion of the Court, based on the testimonial and documentary evidence presented at hearing, that Ed Wheeler constructed the Fence on what he and  the local land surveyor believed to be the boundary between the Wheeler property and the Isgar property.   The Fence was intended to be a boundary fence, and was understood by the Isgars to be a boundary fence.   The Fence was believed by both parties to delineate  the north/south boundary between the Wheeler property and the Isgar Property.   The parties conducted themselves for the subsequent approximately 40 years based on the Fence being the boundary between the respective parties.

29.      Since the time the Fence was constructed in 1964 until 2003, the Wheelers and Isgars appeared to believe that the Fence was located on the 1/16th section line and lot line defining the boundary between the Wheeler Property and the Isgar Property. Accordingly, the Isgars' and the Wheelers' reliance on the section line legal descriptions when entering into oil and gas leases or mortgages is not dispositive of the issue of ownership of the disputed parcel.

## CONCLUSIONS OF LAW

1.      The Isgars claim ownership of the Disputed Parcel based on outright ownership of the Disputed Parcel or, in the alternative, based on the doctrine of acquiescence pursuant to Colorado Revised Statutes § 38-44-109 or adverse possession.  For the reasons set forth below, the Court concludes that, under any of these theories, the Isgars have met their burden of proof that they are the owners of the Disputed Parcel.

2.      With respect to the issue of ownership of the Disputed Parcel, the Isgars presented evidence at the Hearing through Daryl Crites that local surveyors and property owners deemed the Fence to have been constructed on the 1/16th line of Section 12U and the lot line between Lot 3 and Lot 4 of Section 7U.  The 1982 BLM Retracement Survey, which located the 1/16th line approximately 150 feet south of the Fence has no impact on the property rights of the parties.  A resurvey by the federal government may not adversely affect "the established and recognized property rights of private landowners." Lujan v. United States, 673 F.2d 1165, 1168 n.5 (10th Cir. 1982).  This is because, by statute,

9

> [t]he Secretary of Interior may, as of March 3, 1909, in his discretion cause to be made, as he may deem wise under the rectangular system on that date provided by law, such resurveys or retracements of public lands as, after full investigation, he may deem essential to properly mark the boundaries of the public lands remaining undisposed of: Provided, That no such resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands.

43 U.S.C. § 772.  The Tenth Circuit has interpreted this statute to mean that, although the government has the power to survey its own lands, "once a [land] patent has issued, the rights of patentees are fixed and the government has no power to interfere with these rights, as by corrective resurvey." United States v. Reimann, 504 F.2d 135, 139 (10th Cir. 1974).  In other words, "[a] precisely accurate resurvey cannot defeat ownership rights flowing from the original grant and the boundaries originally marked off." United States v. Doyle, 468 F.2d 633, 636 (10th Cir. 1972).  Accordingly, the BLM Retracement Survey cannot divest the Isgars of their property rights in the Disputed Parcel and is, therefore, of no consequence to the determination of the respective property rights of the Isgars and the Wheelers.  Given the historical recognition of the Fence as the boundary line consistent with the deeds into the Isgars and the Wheelers, the Isgars own the Disputed Parcel as having been historically recognized as part of the property conveyed to them in 1964.

　　　　　3.　　Assuming *arguendo* that the Isgars did not acquire the Disputed Parcel at the time they acquired the Isgar Property in 1964, the Court nevertheless determines that the Isgars own the Disputed Parcel by acquiescence.  Boundaries and corners are permanently fixed when they are recognized and acquiesced in for twenty years.  *See* Colo. Rev. Stat. § 38-44-109.  Determining "whether a fence is acquiesced in as a boundary or merely exists as a

barrier is a question of fact to be decided by the trial court." Hartley v. Ruybal, 414 P.2d 114, 116 (Colo. 1966). In order to reach a finding of acquiescence, there must be mutuality in fixing the boundary. *See* Prieshof v. Baum, 29 P.2d 1032, 1034 (Colo. 1934). In assessing the question of mutuality, the Colorado Supreme Court has determined that "[o]ne of the tests of acquiescence in a boundary line in addition to the existence of a fence over the prescribed period of time is the actual possession and dominion over the property up to a fence." Hartley, 414 P.2d at 116.

4. With these principles in mind, the Court concludes that the Isgars own the Disputed Parcel by acquiescence. The Court's conclusion is based on the following conduct by the Isgars with respect to the Disputed Parcel: (1) chaining up to the Fence line; (2) grazing cattle on the property; (3) requiring the Wheelers to remove cattle that strayed on the property; (4) cutting and removing Christmas trees; (5) hunting and authorizing others to hunt on the property; (6) gating the property and padlocking the gate to exclude others from accessing the property; (7) selling portions of this property to Animas Air Park and receiving compensation; and (8) licensing the BOR to dig a large test pit along the south side of the Fence and retaining compensation for such. These activities by the Isgars went unchallenged by the Wheelers for nearly forty years. In fact, the Wheelers testified that they knew that the Isgars were treating the Disputed Parcel as their own and did not object.

5. The Court's determination that the Disputed Parcel is owned by the Isgars through acquiescence is further bolstered by the Wheelers' conduct, which demonstrates that the Wheelers similarly treated the Fence as the true boundary between the Isgar Property and

Wheeler Property.  In particular, the Wheelers engaged in the following activities: (1) obtaining a boundary survey, staking the boundary, and constructing the Fence; (2) executing a contract for sale, option agreement, warranty deed and quit claim deed, all of which reference the Fence as the southern boundary of the Wheeler Property; (3) submitting soil conservation and erosion maps to the United States Department of Agriculture identifying the Fence as the Southern Boundary of the Wheeler Property; (4) authorizing their sand and gravel mining tenant to submit maps and diagrams to the State of Colorado identifying the Fence as the Southern Boundary of the Wheeler Property; and (5) selling all of property north of the Fence to Mobile Premix in 1998 and, again, identifying the Fence as the Southern Boundary of the Wheeler Property.

6.     In sum, the Court construes the conduct of the Isgars and Wheelers sufficient to establish that the Isgars exercised the requisite possession and dominion over the Disputed Parcel for the statutory period.  *See* Hartley, 414 P.2d at 116.  Accordingly, the Court holds that the Isgars own the Disputed Parcel by acquiescence.  *See* Colo. Rev. Stat. § 38-44-109.

7.     The Court is similarly convinced that, in the alternative, the Isgars own the Disputed Parcel by adverse possession.  In order to acquire title by adverse possession,

> a party must establish by a preponderance of the evidence that his possession was actual, adverse, hostile, under a claim of right, exclusive, and uninterrupted for the statutory period.

Sleeping Indian Ranch, Inc. v. West Ridge Group LLC, 107 P.3d 1028, 1031 (Colo. App. 2004). In Colorado, the statutory period is eighteen years.  Colo. Rev. Stat. § 38-41-101(1).  In order to satisfy the requirement that possession is hostile, the party claiming adverse possession

must demonstrate an intention to claim exclusive ownership of the property occupied. The possessor need not have the specific intent to take property from the owner for the hostility requirement to be satisfied. Rather, all that is required is occupancy of the property adverse to the rights of the record owner.

Sleeping Indian Ranch, 107 P.3d at 1031.

8.     As enumerated above, the Isgars engaged in a variety of activities related to the Disputed Parcel from the time the Fence was built in 1964 until around 2003, when the government commenced this condemnation action. These activities, including but not limited to, grazing cattle on the Disputed Parcel, chaining the property up to the Fence line, hunting and allowing others to hunt on the Disputed Parcel, gating and excluding others from access to the Disputed Parcel, and selling portions of the property to Animas Air Park are indicative of the Isgars' "intention to claim exclusive ownership" of the Disputed Parcel. See Trask v. Nozisko, 134 P.3d 544, 549 (Colo. App. 2006). Additionally, and perhaps most significantly in the Court's view, is the fact that the Wheelers knew that the Isgars were treating the Disputed Parcel as their own and chose not to object during the statutory period. Indeed, the Isgars treated the Disputed Parcel as their own without opposition for a period of time that is more than twice the prescribed statutory period. Thus, in light of the facts, the Court concludes that the Isgars' ownership of the Disputed Parcel "was actual, adverse, hostile, under a claim of right, exclusive, and uninterrupted for the statutory period." Sleeping Indian Ranch, 107 P.3d at 1031.


9.     The evidence offered by the Wheelers in an attempt to defeat the Isgars' claims of ownership is not persuasive. As stated above, the Court does not find the testimony of the Wheelers credible regarding the alleged placement of the Fence and the alleged

13

"gentlemen's agreement." Thus, the Court does not attach any weight to this evidence in rendering its decision. Moreover, to the extent that the Wheelers rely on evidence that relates to incidents that occurred after the statutory periods already ran (*i.e.*, 1984 for the acquiescence claim and 1982 for the adverse possession claim), such evidence is irrelevant as title to the Disputed Parcel vested in the Isgars after the statutory periods passed. *See* Palmer Ranch Ltd. V. Suwansawasdi, 920 P.2d 870, 873 (Colo. App. 1996); Doty v. Chalk, 632 P.2d 644, 646 (Colo. App. 1981).

10. In the evidentiary hearing held before the Court, the Isgars carried the burden of establishing that they are the owners of the Disputed Parcel by a preponderance of the evidence. *See, e.g.,* Sleeping Indian Ranch, 107 P.3d at 1031.

Based on the foregoing, the Court recommends the entry of an Order finding that the Isgars have met their burden of proof, by a preponderance of the evidence, and are, in fact, the owners of the Disputed Parcel.

## RECOMMENDATION

For the above reasons, it is recommended that the Isgars be awarded the Disputed Parcel.

Within ten (10) days after being served with a copy of the Proposed Findings and Recommendation, a party may serve and file written objections to the Proposed Findings and Recommendation with the Clerk of the United States District Court for the District of Colorado. The District Court Judge shall make a *de novo* determination of those portions of the proposed

findings or specified recommendation to which objection is made.  The District Court Judge may accept, reject, or modify, in whole or in part, the Proposed Findings and Recommendation made by the Magistrate Judge.  The Judge may also receive further evidence or recommit the matter to the Magistrate Judge with instructions.

Failure to make timely objections to the Magistrate Judge's recommendation may result in a waiver of the right to appeal from a judgment of the District Court based on the findings and recommendation of the Magistrate Judge.

Dated: September 19, 2006.

BY THE COURT:

s/Gudrun Rice

_____

U.S. Magistrate Judge Gudrun J. Rice